UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RPM FREIGHT SYSTEMS, LLC,                          Case No. 21-cv-11964

     Plaintiff,                                   F. Kay Behm

v.                                                 United States District Judge

K1 EXPRESS, INC.,

     Defendant.

_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21)
AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT (ECF No. 50)</u>**

I.      INTRODUCTION

This matter is before the court on cross motions for summary judgment:

Plaintiff RPM Freight Systems, LLC's ("RPM") motion for summary judgment (ECF

No. 21), filed on June 6, 2022, and Defendant K1 Express, Inc.'s ("K1") motion for

summary judgment (ECF No. 50), filed on January 16, 2023.  RPM filed their initial

Complaint on August 24, 2021, after a fire on K1's truck destroyed a number of

vehicles being transported pursuant to a contract between the two parties.  (ECF

No. 1).  RPM originally brought three counts against K1: breach of

contract/defense and indemnification (Count I), declaratory relief (Count II), and

unjust enrichment/common law indemnification (Count III).  (ECF No. 1).  On

November 21, 2021, K1 filed a motion to dismiss counts II and III of RPM's

complaint, arguing that RPM's claim for a declaratory judgment was redundant

with the damages sought for breach of contract and the claim for unjust

enrichment arose out of the same express contractual relationship.  (*See* ECF No.

11, 12).  District Judge Nancy G. Edmunds granted K1's motion on January 12,

2022.  (ECF No. 16).  Likewise, only Count I for breach of contract/defense and

indemnification remains.

This case was reassigned to the undersigned on February 6, 2023.  The

court held a hearing on these motions on July 12, 2023, and both parties

participated in oral argument.  (*See* ECF No. 55).  For the reasons stated below,

the court **GRANTS IN PART AND DENIES IN PART** RPM's motion and **GRANTS IN**

**PART AND DENIES IN PART** K1's motion.

## II.    FACTUAL BACKGROUND

RPM is a freight broker that arranges freight and finished vehicle

transportation and often acts as an "intermediary between clients and carriers to

ensure secure transportation of various types of cargo."  (ECF No. 21,

PageID.152).  K1 is a carrier who transports various types of cargo, including

vehicles.  *Id*.  On July 15, 2016, RPM and K1 entered into a written Broker-Carrier

Agreement wherein K1 would "perform transportation of shipments that [RPM] has obtained under its arrangements with its Customers." (ECF No. 21-2, PageID.168, "Broker-Carrier Agreement").  On September 16, 2019, the parties signed a Rate Confirmation in which K1 agreed to transport seven 2019 Tesla vehicles (the "subject vehicles") from Tesla's factory in Fremont, California to Tesla dealerships in Lyndhurst, Ohio and Wexford, Pennsylvania. (ECF No. 23, PageID.234; *see also* ECF No. 21-3, "Rate Confirmation").  The parties subsequently signed a Bill of Lading for the subject vehicles on September 24, 2019. (ECF No. 21-4, "Bill of Lading").

On September 24, 2019, K1's driver, Reginaldo Alcantara, picked up the subject vehicles in Fremont, California. (ECF No. 21, PageID.154).  The vehicles were loaded onto Alcantara's truck and were secured without issue. (ECF No. 50, PageID.773).  Later that day, however, the tractor-trailer carrying the vehicles caught fire while in transit, completely destroying the subject vehicles. (ECF No. 21, PageID.154).  As a result, Tesla sought reimbursement in the amount of $337,000, which RPM paid on December 24, 2019. *Id.*; *See also* ECF No. 21-7, Tesla Payment.

On November 19, 2019, K1 submitted a claim to their insurer, Great American Insurance Company, for the damaged vehicles. (ECF No. 50,

PageID.767).  K1 argues "at all relevant times, they were insured under an automobile liability policy, subject to a limit of $1,000,000.00, and a motor truck cargo liability policy, with a limit of $250,000.00 per occurrence."  *Id*.  Great American conducted an investigation and denied liability on K1's behalf, stating that "the damage was caused by inherent vice or nature of the good involved, i.e., the source of the fire was a vehicle being transported."  (ECF No. 50-9, PageID.824, Great American Determination Letter).  K1 denied RPM's demand to defend or indemnify them for the $337,000 damage to the subject vehicles.  (ECF No. 1, PageID.4).

RPM and K1 now both independently argue they are entitled to summary judgment as to Count I of RPM's complaint for breach of contract pursuant to Fed. R. Civ. P. 56 because there are no remaining questions of material fact.  (ECF No. 21, PageID.144; ECF No. 50, PageID.757).

## III.    LEGAL STANDARD

A motion for summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where parties have filed cross-motions for summary judgment, the court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the

nonmoving party." *Hensley v. Gassman*, 693 F.3d 681, 686 (6th Cir. 2012) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)).  The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the moving party meets this burden, the burden then shifts to the nonmoving party to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox. v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

**IV.   ANALYSIS**

In their complaint, RPM argues that K1 breached the parties' contract by refusing to indemnify RPM for the damage to the subject vehicles and by failing to procure the required insurance coverages or name RPM as an additional insured on their insurance policies.  (ECF No. 1, PageID.4-5).  Under Michigan law, "a party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach."  *Miller-Davis Co. v. Ahrens*

*Const., Inc.*, 495 Mich. 161, 178 (2014).  The parties do not contest that the

Broker-Carrier Agreement, Rate Confirmation, and Bill of Lading formed a valid

contract between the parties for the transport of the subject vehicles.  (*See* ECF

No. 53, PageID.1172).  Rather, the key dispute is whether K1's actions were in

breach of this contract.  The arguments raised in the parties' competing motions

for summary judgment can be distilled down to three main questions: (1) is RPM's

claim for breach of contract barred by the voluntary payment doctrine?; (2) is

there a question of fact remaining as to whether K1 breached the contract by

failing to indemnify RPM?; and (3) is there a question of fact remaining as to

whether K1 breached the contract by failing to procure the required insurance

coverage?  The court will address each of these questions in turn.

     A.    <u>Voluntary Payment Doctrine</u>

As an initial matter, K1 argues that RPM lacks standing to advance their

contractual indemnity claim because it is barred by the "voluntary payment

doctrine." (ECF No. 50, PageID.777).  Specifically, K1 argues that RPM was under

"no contractual obligation to indemnify Tesla for the subject loss," and, therefore,

their decision to pay was driven not by a legal obligation, but by "the nature of

the business relationship between the parties."  *Id.*, PageID.780.  RPM disagrees,

arguing the voluntary payment doctrine does not apply, because they were

"legally obligated to pay Tesla pursuant to the Tesla agreement." (ECF No. 53, PageID.1160).

Under Michigan law, the voluntary payment doctrine provides, "where money has been voluntarily paid with full knowledge of the facts, it cannot be recovered on the ground that the payment was made under a misapprehension of the legal rights and obligations of the person paying." *Montgomery Ward & Co. v. Williams*, 330 Mich. 275, 285 (1951); *see also Pingree v. Mut. Gas. Co.*, 107 Mich. 156, 157 (1895); *Skavik v. Baskin L. Firm.*, No. 311905, 2013 WL 6921530, at *2 (Mich. Ct. App. Dec. 26, 2013). Michigan law further defines a "volunteer" as "one who intrudes himself into a matter which does not concern him, or one who pays the debt of another without request, when he is not legally or morally bound to do so, and when he has no interest to protect in making such payment." *Esurance Prop. & Cas. Ins. Co. v. Michigan Assigned Claims Plan*, 507 Mich. 498, 511 (2021) (citing *Detroit Auto. Inter. Ins. Exch. v. Detroit Mut. Auto. Ins. Co.*, 337 Mich. 50, 54 (1953)); *see also Home-Owners Ins. Co. v. AMCO Ins. Co.*, No. 357273, 2023 WL 327855, at *8 ("Logically then, an insurer who has at least an arguable duty to pay is clearly not a volunteer."). This definition was initially applied to an equitable subrogation claim in *Esurance Prop. & Cas. Ins. Co.*, but other courts in this district have since utilized the definition in cases involving the voluntary

7

payment doctrine.  *See Taybron v. Liberty Mut. Pers. Ins. Co.*, No. 20-10925, 2022 WL 1598585, at *3 (E.D. Mich. May 19, 2022) (holding "an insurer who has an 'arguable duty to pay' under a policy is 'protecting its own interests and not acting as a volunteer.'").

RPM argues the voluntary payment doctrine does not apply because they were "legally obligated to pay Tesla pursuant to the Tesla agreement."  (ECF No. 53, PageID.1160).  The agreement between RPM and Tesla states, in part:

> Supplier will indemnify, defend, and hold harmless Tesla….from any and all losses arising from, in connection with, or based on allegation of any of the following: (a) any Claim by, on behalf of or relating to Supplier Personnel; (b) any Claim that, if true, would constitute a breach of Supplier's obligations under Section 6 (Confidentiality); (c) any Claim that, if true, would arise from or be attributable to a breach of Supplier's obligations under Section 2.7 (Compliance with Laws and Tesla Policies); (d) any Claim that, if true, would arise from or be attributable to a breach of Supplier's obligations under Section 9.2 (Non-Infringement); (e) any Claim for death or bodily injury, or the damage, loss or destruction of **real or tangible personal property of third parties** (including employees of Tesla and Supplier and their respective subcontractors) **caused by the tortious conduct of Supplier**, any Supplier Personnel, or any of Supplier's third-party suppliers; and (f) the inaccuracy or untruthfulness of any representation or warranty made by or on behalf of Supplier in the Agreement.

(ECF No. 53-3, PageID.1197, "Tesla Agreement").  Tesla's letter to RPM argues "there is no dispute that the vehicles were damaged while in K-1's possession and prior to arrival at their final destination" and "K-1 and RPM are responsible for

this loss and [] Tesla should be reimbursed…"  (ECF No. 53-7, PageID.1125-26,

Tesla Demand Letter).  However, the plain language of the Tesla Agreement does

not require RPM to indemnify Tesla for any "damage, loss, or destruction of any

real or tangible personal property," but only the property "of third

parties…caused by the tortious conduct of Supplier, any Supplier Personnel, or

any of Supplier's third party suppliers."  (ECF No. 53-3, PageID.1197).  The damage

to the subject vehicles did not involve the property of third parties and did not

result from any tortious conduct.  As such, the Tesla Agreement did not obligate

RPM to reimburse Tesla under these circumstances.

However, regardless of whether RPM was legally obligated to indemnify

Tesla under the Tesla Agreement, the voluntary payment doctrine does not apply

because RPM does not fit the definition of a "volunteer" under these

circumstances.  *See Taybron*, 2022 WL 1598585, at *3.  As will be discussed in

further detail below, K1 is obligated to compensate RPM for "any losses" arising

from damaged goods.  (ECF No. 21-2, PageID.171).  Once RPM collects payment

from K1 for the vehicles belonging to Tesla, RPM has an equitable, if not

contractual, duty to promptly remit those funds to Tesla.  By making the initial

payment to Tesla, RPM was protecting its own interests, not acting as a "mere

volunteer."  *Esurance Prop. & Cas. Ins. Co.*, 507 Mich. at 511; *see also Taybron*,

2022 WL 1598585, at *3; *Ravenell v. Auto Club Ins. Ass'n*, No. 348436, 2022 WL

258221, at *3 (Mich. Ct. App. Jan 27, 2022) ("NGM was protecting its interests

because failure to pay PIP benefits could result in litigation and violation of the

no-fault act.").  As such, the voluntary payment doctrine does not bar RPM's case.

     B.    <u>Breach of Contract Claims</u>

To establish a breach of contract under Michigan law,[1] a party must show

"(1) there was a contract, (2) the other party breached the contract, and (3) the

breach resulted in damages to the party claiming breach."  *Bank of Am., N.A. v.*

*First Am. Title Ins. Co.*, 499 Mich. 74, 100 (2016).  Neither party contests the

validity of the Broker-Carrier agreement.  (*See* ECF No. 21, PageID.156) ("it is

undisputed that RPM and K1 entered into the written agreement on July 16,

2016.").  Rather, the parties' motions focus on whether K1 breached the express

terms of the contract by refusing to indemnify RPM or by failing to maintain

adequate insurance.

     *i.*    *Refusal to Indemnify*

The court must first determine whether there is a question of fact

remaining as to K1's obligations to indemnify RPM under the terms of the

---

[1] The Broker-Carrier Agreement states "[t]his agreement shall be governed by and construed in accordance with the laws of the State of Michigan…"  (ECF No. 21-2, PageID.169).  Neither party has contested that Michigan law should be applied to their dispute.

contract.  RPM's motion for summary judgment argues there is no question that
the parties' contract explicitly requires K1 to "defend, indemnify, and hold
harmless RPM for the damage incurred to the Tesla vehicles while being
transported by K1."  (ECF No. 21, PageID.157).  K1's motion for summary
judgment alternatively argues that "the inherent vice exception to Carmack
Amendment liability applies to absolve K1 of any legal liability for the damage to
the Subject Vehicles."  (ECF No. 50, PageID.783).  Considering the text of the
contract, which must be interpreted "according to its plain unambiguous terms,"
*Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 483 (2005), the court now finds that the
Carmack Amendment does not apply and K1 is contractually required to
compensate RPM for any damage to the subject vehicles.

The Carmack Amendment to the Interstate Commerce Act creates a
national scheme of carrier liability for loss or damage to goods transported in
interstate commerce.  *Excel, Inc. v. S. Refrigerated Transp., Inc.*, 807 F.3d 140, 148
(6th Cir. 2015).  Under the Amendment, a motor carrier[2] is liable "for any loss,
damage or injury" caused by such carriers to property received for them by
transportation, unless they can show that the damage was caused by "(a) the act

---

[2] Under the Interstate Commerce Act, a "motor carrier" is defined as "a person
providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).

of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods…"  *Plough, Inc. v. Mason and Dixon Lines*, 630 F.2d 468, 470 (6th Cir. 1980) (citing *Missouri Pacific R.R. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964)).  In other words, the Carmack Amendment imposes strict liability on motor carriers for "actual loss or injury to property," subject to only the listed exceptions.  49 U.S.C. § 14706(a).  The Carmack Amendment generally applies to all motor carrier transactions in interstate commerce "unless the shipper has agreed to some limitation in writing."  *Excel. Inc.*, 807 F.3d at 148.

Numerous courts have also held that the Carmack Amendment applies only to transactions between "motor carriers" and "freight forwarders,"[3] specifically

---

[3] The Interstate Commerce Act defines a "freight forwarder" as:

a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business –
(A) assembles and consolidates or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and
(C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

49 U.S.C. § 13102(8).

exempting "brokers"[4] from its coverage.  *See, e.g., Total Quality Logistics, LLC v. O'Malley*, No. 1:16-CV-636, 2016 WL 4051880, at *3 (S.D. Ohio July 28, 2016) ("Since Plaintiff is a broker, it is not subject to the Carmack Amendment."); *Mitsui Sumitomo Ins. USA, Inc. v. Maxum Trans, Inc.,* No. 3:16-CV-191, 2016 WL 7496737, at *2 (S.D. Ohio Dec. 30, 2016) ("The liability provision of the Carmack Amendment…does not apply to brokers."); *VPP Grp., LLC v. Total Quality Logistics, LLC.*, No. 13-CV-185-WMC, 2014 WL 1515510, at *10 (W.D. Wis. Apr. 18, 2014) ("[w]hile Carmack provides the exclusive means for a shipper seeking recovery from a carrier under a bill of lading, it does not govern brokerage relationships…").  The Sixth Circuit has not definitively ruled on whether the Carmack Amendment's liability provisions apply to brokers, but it has held that brokers do not have a direct right to sue under the statute.  *See Excel, Inc.*, 807 F.3d at 148-49.  While the present action was not brought directly under the Carmack Amendment, the liability provisions cited by K1, including the relevant defenses, likely do not apply to the transaction between RPM and K1.

---

[4] The Interstate Commerce Act defines a "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."  49 U.S.C. § 13102(2).

However, even if the provisions do apply to this broker-carrier relationship, the Carmack Amendment's liability provisions were explicitly waived in the parties' contract.  The Carmack Amendment states, "if the shipper and carrier, in writing, expressly waive any or all rights and remedies under this part for the transportation covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies."  49 U.S.C. § 1401(b)(1).  The Broker-Carrier Agreement includes such a waiver, stating: "[b]roker and carrier hereby expressly waive all provisions of Chapters 137 and 147[5] and any other provisions of Subtitle IV, Part B of Title 49, United States Code, to the extent that such provisions are in conflict with express provisions of this Agreement."  (ECF No. 21-2, PageID.173).

The contract further provides, in part:

¶ 16: Carrier shall pay to Broker, or Broker may offset from the amounts Broker owes Carrier, for **any losses** arising from goods so lost, delayed, damaged, or destroyed…

¶ 17: Carrier agrees to indemnify, defend and hold Broker and its Customers…harmless from and against **any and all fines, penalties, costs, demands, damages (including bodily injury and property damage), losses, obligations, claims, liabilities, and expenses (including reasonable attorney's fees)**…

---

[5] The liability portions of the Carmack amendment are located at 49 U.S.C. § 14706.

(ECF No. 21-2, PageID.171) (emphasis added).  The express language of paragraph 16, which states that K1 is liable for "any losses," and paragraph 17, which states that K1 must indemnify Broker "from and against any and all fines, penalties, costs, demands, damages…" conflicts with the language of the Carmack Amendment, which creates a number of exceptions to liability.  *See* 49 U.S.C. § 14706.  Because this language is "in conflict with the express provisions of [the Broker-Carrier Agreement]," the parties have expressly waived all relevant sections of the Carmack Amendment that are not explicitly included in the agreement.  *See Sanofi-Aventis U.S., LLC v. Great Am. Lines, Inc.*, No. CV102023MASTJB, 2016 WL 4472949, at *2 (D.N.J. Aug. 22, 2016) ("Here, the reasonable explanation for the inclusion of the limiting language in the waiver – 'to the extent that such provisions conflict' – is that Sanofi and GAL agreed to waive the Carmack Amendment as a whole, but wanted to make clear that any of the default rules of the Carmack Amendment that they wrote specifically into the Transportation Contract should not be disturbed."); *see also E. Express, Inc. v. Pete Rahn Constr. Co.*, 554 F. Supp. 3d 960, 965 (S. D. Ill. 2021) (holding language in the contract stating the "litigants 'expressly waive all provisions of Chapters 137 and 147…to the extent such provisions are in conflict with express provisions'

of the contract" was sufficiently unambiguous and constituted a waiver of the

Carmack Amendment.).

Because the Carmack Amendment has been effectively waived by the

parties, K1's obligations to RPM are governed by the express language of the

contract.  The portions of the contract relevant to liability provide:

> ¶ 16 Cargo Liability: Carrier assumes liability as a common carrier[6] for
> loss, damage to or destruction of the goods entrusted to it or its
> permitted subcontractor's care, custody or control and shall provide
> evidence of a BMC-32 Endorsement upon request.  Carrier shall pay
> to Broker, or Broker may offset from the amounts Broker owes
> Carrier, for **any losses arising from goods so lost, delayed, damaged
> or destroyed.**  Carrier shall not allow any of the goods tendered to
> Carrier to be sold or made available for sale or otherwise disposed of
> in any salvage markets, employee stores or any other secondary
> outlets within 60 days of the receipt of a claim.  Carrier agrees to
> notify Broker's Claims Department in writing, immediately whenever
> an accident or potential claim occurs and provide Broker with any
> written reports, affidavits or other assistance necessary to assess the
> claim.

> ¶ 17 Indemnification: Carrier **aggress [sic] to indemnify, defend and
> hold Broker and its Customers,** and their respective officers,
> directors, managers, members, shareholders, employees, agents and
> assigns, harmless **from and against any and all fines, penalties,
> costs, demands, damages (including bodily injury and property**

---

[6] K1 argues that the phrase, "assumes liability as a common carrier" suggests their
liability is governed by the Carmack Amendment.  (*See* ECF No. 54, PageID.1314).  However, the
Broker-Carrier agreement does not specifically define "common carrier" or "common carrier
liability" and does not otherwise suggest that the parties intended this term alone to signal the
contract includes the Carmack Amendment defenses.  *See Detroit v. A W Kutsche & Co.*, 309
Mich. 700, 709 (1944) (The court must "strive to give all of [a contract's] terms reasonable,
effective and lawful meaning.").

**damage) losses, obligations, claims, liabilities and expenses** (including reasonable attorney's fees) of whatever type or nature arising out of or related to: (i) the maintenance, use or operation (including loading and unloading by Carrier, Carrier's agents or contractors) of any motor vehicle or equipment in performance of services under this Agreement; (ii) any and all acts or omissions of Carrier, its agents, employees or contractors in providing the transportation services to be provided under this Agreement; (iii) an alleged violation by Carrier, as well as Carrier's agents or contractors, of any federal, state, or municipal law, rule or regulation related to Carrier's transportation services, and (iv) any use operation, maintenance or possession of any owned or leased equipment by Carrier, Carrier's agents or contractors.  The obligations of Carrier under this Section shall survive termination of this Agreement.

(ECF No. 21-2, PageID. 171).  The signed Rate Confirmation Agreement[7] further states, in part:

¶ 7: Pursuant to the RPM carrier contract, carrier will provide an amount of cargo insurance coverage sufficient to cover the **loss or damage of any commodities and cargo carried**.  Carrier's cargo insurance policy must not exclude from coverage any commodities or cargo carried on this order…

(ECF No. 21-3, PageID.179).

Where, as here, "parties have expressly contracted with respect to the duty to indemnify, the extent of the duty must be determined from the language of the contract." *Grand Trunk W. R.R. v. Auto Warehousing Co.*, 262 Mich. App. 345,

---

[7] The Rate Confirmation includes a section titled "RPM BROKER CARRIER AGREEMENT; ADDITIONAL TERMS," which "CONSTITUTES AN ADDENDUM TO THE TERMS AND CONDITIONS OF THAT CERTAIN BROKER CARRIER AGREEMENT [] PREVIOUSLY EXECUTED BETWEEN OUR COMPANIES."  (ECF No. 21-3, PageID.178).

353 (2004).  If language included in a contract is "clear and unambiguous, it is to be construed according to its plain sense and meaning."  *Grosse Pointe Park v. Michigan Muni Liability & Prop. Pool*, 473 Mich. 188, 198 (2005).  The court agrees with K1 that the language of paragraph 17 requiring carrier to "indemnify, defend and hold Broker…harmless from and against any and all fines, penalties, costs, demands, damages (including bodily injury and property damage) losses, obligations, claims, liabilities, and expenses (including reasonable attorney's fees) of whatever type or nature…" is ambiguous as to what fines, costs, or otherwise are, in fact,

> arising out of or related to (i) the maintenance, use or operation (including loading and unloading by Carrier, Carrier's agents or contractors) of any motor vehicle or equipment in performance of services under this Agreement; (ii) any and all acts or omissions of Carrier, its agents, employees or contractors in providing the transportation services to be provided under this Agreement; (iii) an alleged violation by Carrier, as well as Carrier's agents or contractors, of any federal, state, or municipal law, rule or regulation related to Carrier's transportation services, and (iv) any use operation, maintenance or possession of any owned or leased equipment by Carrier, Carrier's agents or contractors.

(ECF No. 21-2, PageID. 171).  However, this only raises a question of fact as to what additional damages or costs may be owed to RPM.  There is still no question of fact remaining that the plain language of paragraph 16, when read together with the other listed sections, unambiguously states that K1 is fully liable for "**any**

18

losses" to the goods being transported and is required to indemnify RPM for **any**

resulting property damage to the "goods so lost, delayed, damaged or

destroyed," without exception.  (ECF No. 21-2, PageID.171).  Because K1 refused

to do so, there is no question of fact remaining that they are in breach of the

parties' contract and summary judgment is granted as to this issue.

ii.   *Failing to Procure Required Insurance Coverages*

Finally, the court must determine whether there is a question of fact

remaining as to K1's failure to obtain the insurance coverage required by the

Broker-Carrier Agreement.  K1's motion for summary judgment argues that they

maintained the required commercial automobile liability insurance with a limit of

$1,000,000 and, separately, cargo liability insurance with a limit of $100,000 at all

times relevant to this dispute.  (ECF No. 23, PageID.240-41).  RPM's motion for

summary judgment does not dispute this claim, but rather argues that K1

breached the contract by failing to make RPM an "additional insured" under its

Great American Policy.  (ECF No. 24, PageID.278).  The contract between the two

parties requires, in part:

> ¶ 15 Insurance: Carrier, at Carrier's expense, shall maintain during
> the term of this Agreement commercial automobile liability
> insurance for the benefit of Broker and Customer, covering all
> vehicles however owned or used by Carrier to transport Broker's
> shipments and property damage arising out of Carrier transportation

under this Agreement, with minimum limits of not less than One
Million Dollars ($1,000,000) per occurrence for personal injury
(including death) and property damage, cargo liability insurance with
minimum limits of not less than One Hundred Thousand Dollars
($100,000) per occurrence…Carrier shall cause the required
insurance to be procured **naming Broker as an "additional insured"
on any public liability, general liability and/or automobile liability
policies.** Upon request of Broker, Carrier shall furnish to Broker
written certificates obtained from each insurance carrier showing
that the required insurance has been procured. Carrier's insurance
will be deemed primary in the event of loss or damage. Carrier's
indemnification obligations described in this agreement, including
Section 17 below, will not be reduced or limited by the actual
insurance policy limits that Carrier chooses to purchase. If Carrier
fails to maintain such insurance, Broker may do so and charge Carrier
for such cost and offset in accordance with this Agreement.

(ECF No. 21-2, PageID.171) (emphasis added).

The unambiguous language of paragraph 15 establishes that RPM was only

required to be listed as an "additional insured" on any "public liability, general

liability, and/or automobile liability policies." The contract expressly excludes

"cargo liability" from this list. This is in direct conflict with the list of required

insurance policies just a few sentences before, which specifies that the carrier

must maintain "commercial automobile liability insurance…**cargo liability**

**insurance**…and if requested by Broker, commercial general liability insurance. *Id.*

(emphasis added). There is no question of fact remaining that RPM was not listed

as an additional insured on K1's cargo liability policy with Great American. (*See*

ECF No. 50-7, "Certificate of Liability Insurance").  As such, summary judgment is appropriate as to this issue.  However, this does not impact the outcome of this motion, as K1 is still in breach of the broker-carrier agreement for failure to indemnify, as discussed above.

V.      **CONCLUSION**

For the reasons stated above, the court **GRANTS IN PART AND DENIES IN PART** RPM's motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** K1's motion for summary judgment.  Summary Judgment is granted as to Count I of RPM's complaint for breach of contract, but the question of damages remains.

**SO ORDERED**.

Date:  September 8, 2023              s/ F. Kay Behm
                                     F. Kay Behm
                                     United States District Judge